# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

No. 26-11349

**DANIELLE MORRON,**

Movant-Appellant,

v.

**HUNTINGTON NATIONAL BANK,**

Plaintiff-Appellee,

and

**STANLEY R. KALISH,**

Defendant-Appellee.

**EMERGENCY MOTION TO STAY CONFIRMATION OF APRIL 21, 2026 JUDICIAL SALE AND PRESERVE THE RES PENDING THIS INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(a)(3)**

1

# TABLE OF CONTENTS

**I. INTRODUCTION OF EMERGENCY STAY**…………………………………...4

**II. PROCEDURAL BACKGROUND**……………………………………………...5

**III. THE ORDER APPEALED FROM AT DE 293**……...…………………….…7

**IV. MARINE PERIL FORMING THE BASIS OF APPELLANT'S
PREFERRED MARITIME SALVAGE LIEN**……………………...…………..…8

**V. PREVIOUS DENIAL OF STAY OF CONFIRMATION OF SALE IN
DISTRICT COURT**…………………………………………………………………...9

**VI. LEGAL ANALYSIS OF THE ORDER AT DE 293 RELEVANT TO THE
EMERGENCY STAY AT ISSUE**………………………………………………...…10

    A. Misapplication of *B.V. Bureau Wijsmuller v. United States*……….…..…12

    B. "Abundantly Clear" Is Not a Recognized Salvage Involuntariness
    Standard……………………………………………………………….........12

    C. The Court's Failure to Identify Any Legally Enforceable Preexisting
    Duty………………………………………………………………….…...16

    D. Purchase and Sale Agreement Expressly Disclaimed Implied
    Obligations……………………………………………………...……18

    E. Proximity to the Vessel and Receipt of Notice Do Not Create Compulsory
    Salvage Obligation…………………………………...………20

**VII. LEGAL STANDARD OF STAY PENDING APPEAL**………..……..22

    A. Likelihood of Success on the Merits………………….………...23

    B. Irreparable Injury Absent Stay………………………………………24

    C. Absence of Substantial Injury to Other Interested Parties………..…..…25

    D. Public Interest………………………………………………26

**VIII. CONCLUSION**…………………………………………………..27

**IX. REQUEST FOR EMERGENCY STAY PENDING APPEAL**………..…..27

# TABLE OF AUTHORITIES

*B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333 (2d Cir. 1983)…..........12-18

*Girard v. M/V Blacksheep*, 840 F.3d 1351 (11th Cir. 2016)……………..……18, 23

*Nken v. Holder*, 556 U.S. 418, 434 (2009)…………………………….……….22

*The Blackwall*, 77 U.S. (10 Wall.) 1 (1869)…………………………...……….18

*The Sabine*, 101 U.S. 384 (1879)………………………………………………18

## I.  INTRODUCTION OF EMERGENCY STAY

Movant-Appellant Danielle Morron ("Appellant"), respectfully moves this Court for an emergency stay prohibiting confirmation of sale or transfer of title arising from the April 21, 2026 U.S. Marshal auction of the M/Y SOMETHING ABOUT MERI pending resolution of this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), and states as follows:

This emergency motion is filed pursuant to 11th Cir. R. 27-1 and Federal Rule of Appellate Procedure 8(a)(2). Appellant previously sought substantially similar relief in the district court through **DE 296**. The district court denied the requested stay at **DE 310** after concluding that Appellant had not demonstrated a sufficient likelihood of success on appeal, and previously conditioned any stay upon Appellant posting a bond exceeding $550,000 at **DE 300**, notwithstanding the absence of any deposited substitute proceeds or equivalent security by any other party, including Plaintiff-Appellee, preserving Appellant's asserted maritime lien rights pending appeal.

Appellant further contends that deterioration and damage occurring during substitute custodianship materially impaired the condition and value of the salvaged vessel following dispossession, thereby diminishing the recoverable value of the asserted salvage lien and embedded restoration contributions presently at

4

issue on appeal. Under these circumstances, requiring Appellant to post additional supersedeas-style security, while no equivalent substitute proceeds or security preserving Appellant's competing maritime claims presently exist in the Court registry, would be inequitable, particularly where Appellant's substantial labor, expenditures, restoration efforts, and salvage contributions are already embedded within the res itself, and where unresolved offsets concerning custodial deterioration of the vessel remain pending at **DE 285 at 11**.

## II. PROCEDURAL BACKGROUND

1. Appellant asserted a maritime salvage lien arising from *voluntary* salvage, restoration, stabilization, and preservation efforts performed following marine peril involving flooding and imminent loss of the defendant vessel. **See DE 269 -** Appellant's Declaration Regarding Absence of Preexisting Duty.

2. Appellant expended approximately 2.5 years restoring the vessel to propulsion and preserving the vessel's MTU engines with full knowledge and awareness of the cost and extent of damages of Plaintiff and Defendant-Appellees.

3. On April 17, 2026, the district court denied Appellant's requested authorization to credit bid the asserted salvage lien at judicial sale at **DE 253**, concluding that Appellant's services were not voluntary under maritime salvage law at **DE 293 at 4**.

4. Appellant timely filed a Notice of Appeal pursuant to 28 U.S.C. § 1292(a)(3).

5. On April 21, 2026, the vessel was sold at judicial auction. The high bid was from a third party cash bidder, with the winning high bid initially reported at $500,001, but no deposit was subsequently paid into the Court registry.

6. The publicly noticed terms of sale required the successful bidder to post a 10% deposit and further stated:

> "*Failure to pay the balance in accordance with the terms of the sale shall result in the forfeiture of the monies deposited and the vessel will be re-offered for sale.*"

7. The purported high bidder failed to pay any deposit whatsoever and defaulted under the sale terms and Local Admiralty Rule E(17)(d).

8. Plaintiff-Appellee Huntington National Bank subsequently moved to confirm the sale to itself as purported second-highest bidder at **DE 313** through a $500,000 non-cash credit bid still subject to substantial unadjudicated offsets for custodial damage and use **(DE 285 at 11)** rather than substitute cash proceeds into the court's registry pending this appeal.

9. Appellant sought a stay in the district court at **DE 296** pending appeal of the Order at **DE 293** to the Eleventh Circuit on April 21, 2026. The district court later denied Appellant's relief on April 29, 2026 at **DE 310**, and the court's order to

show cause for the stay at **DE 300** was conditioned on Appellant posting a bond exceeding $550,000, despite the absence of any deposited sale proceeds from any other party preserving Appellant's asserted lien rights pending appeal, should confirmation otherwise proceed before the appeal is heard by the Eleventh Circuit.

## III. THE ORDER APPEALED FROM AT DE 293

On **April 17, 2026**, the district court issued an **Order** at **DE 293** finding that Appellant's services were not "voluntary" under maritime salvage law and denied recognition of Appellant's asserted preferred maritime salvage lien and corresponding credit-bid rights at the **April 21, 2026** judicial sale, based on an incorrect legal standard of review by the district court. Appellant timely appealed pursuant to 28 U.S.C. § 1292(a)(3). In the district court's order at **DE 293,** the court did not contest two of the three prongs of maritime salvage - marine peril or success, only finding that Appellant's services were somehow compulsory, pursuant to a finding by the court that Appellant had an unspecified, unidentifiable obligation to render aid, thereby negating involuntariness by misapplying maritime salvage principles. "*Regardless of Morron's relationship to the vessel, it is abundantly clear at the time of the flood she was under a preexisting obligation to render aid to the boat. That renders any salvage lien arising from services she*

*provided while under that obligation invalid,"* (**DE 293 at 5**) while failing to specify the purported obligation under which such compulsory obligation negating voluntariness of maritime salvage allegedly arose.

## IV. MARINE PERIL FORMING THE BASIS OF APPELLANT'S PREFERRED MARITIME SALVAGE LIEN

Marine peril risking imminent total loss of the hull of a 92-foot, 2005 Mangusta superyacht rapidly arose from a failed galvanized fitting installed on the pressurized side of an open-loop engine room seawater pump, necessitating emergency salvage services to the vessel, followed by a 2.5 year restoration of submerged machinery, which prevented total loss of functionality of the vessel's propulsion system. The failed seawater elbow caused free flowing, pump-driven ingress into the vessel's engine room at a rate of 1800-2400 gallons per hour, and absent Appellant's swift, non-compulsory efforts to reverse submersion, stabilize the vessel, and salvage the mechanical equipment that propels the 130 ton vessel, including the vessel's twin MTU 2000 1600V engines, hydraulics, and related electrical equipment, April 14, 2026 expert testimony at an evidentiary hearing (transcript pending per USCA Doc. 12) confirmed that the vessel's engines and propulsion system would have otherwise been un-rebuildable, resulting in total loss

of the MTU engines, valued at $1 million dollars each, exclusive of installation and ancillary systems likewise affected by saltwater intrusion, such as hydraulics, electrical wiring, and the Kamewa propulsion system.

## V. PREVIOUS DENIAL OF STAY OF CONFIRMATION OF SALE IN DISTRICT COURT

Appellant previously sought a stay of confirmation of sale in the district court at DE 296 to preserve the status quo of the res pending appellate review of the dispositive issue of voluntariness under maritime salvage law. The district court conditioned any stay upon Appellant posting a bond exceeding $550,000, representing 110% of the reported high bid, and ultimately denied relief despite the absence of any deposited sale proceeds or equivalent substitute security by any other party preserving Appellant's asserted maritime lien rights pending appeal. See **DE 300; DE 309; DE 310; DE 313**.

Meanwhile, Plaintiff-Appellee asserted in **DE 309** that the original third-party high cash bidder defaulted, paid no deposit whatsoever to the U.S. Marshal, and failed to complete the purchase requirements under the publicly noticed terms of sale. Plaintiff-Appellee Huntington National Bank now seeks confirmation of title to itself as purported second-highest bidder through a non-cash credit bid at **DE 313**

based upon debt amounts still subject to substantial unresolved offsets for custodial damage and use of the vessel **(DE 285 at 11)**, thereby bypassing the requirement that sale proceeds be deposited into the Court registry to preserve competing maritime claims pending appeal.

Absent immediate appellate intervention, irreparable consequences to Appellant's asserted maritime salvage lien are imminent. The district court may confirm transfer of title free and clear of liens, including Appellant's asserted salvage lien, to Plaintiff-Appellee before adjudication of the dispositive issues presently before this Court, notwithstanding the absence of an adequate substitute res preserving Appellant's competing maritime claims pending appeal. Such transfer would materially impair meaningful appellate relief concerning the validity, priority, and recoverable value of Appellant's asserted maritime salvage lien.

## VI. LEGAL ANALYSIS OF THE ORDER AT DE 293 RELEVANT TO THE EMERGENCY STAY AT ISSUE

This emergency motion for stay concerns the district court's **Order** at **DE 293**, issued April 17, 2026, denying Appellant's *preferred maritime salvage lien,* finding that

> *"Regardless of how one defines the relationship between Morron and the boat, it is abundantly clear that at the time of the flood she was under a preexisting obligation to render aid to the boat. That renders any salvage lien arising from services she provided while under that obligation invalid."*

**(DE 293 at 5).**

Such salvage lien was expressly contemplated by the Plaintiff-Appellee's marine note, which references liens "in an emergency, for salvage." DE 1-4 at 6 ¶26 ("Liens"). Plaintiff-Appellee was repeatedly placed on notice of Appellant's intent to assert a salvage lien during the salvage and rebuild process, and both Plaintiff and Defendant-Appellees acquiesced to Appellant's restoration efforts throughout the 2.5-year rebuild. Nine days after successful sea trial restored the vessel to propulsion, Plaintiff-Appellee dispatched private individuals to seize the vessel from Appellant in St. Thomas, U.S. Virgin Islands, prior to commencement of the Rule C arrest process.

Plaintiff-Appellee later argued, without supplying any evidence of Appellant's consent to accept a binding legal duty requiring Appellant to act to either

     1. salvage the vessel in the event of marine peril, or

     2. personally finance such salvage effort as a prospective purchaser,

that Appellant's services were not voluntary and hence, once the vessel was in the possession of Plaintiff-Appellee, claimed Appellant owed such salvage and rebuild

11

services to Plaintiff-Appellee as a matter of right without any compensation whatsoever.

### A. Misapplication of *B.V. Bureau Wijsmuller v. United States*

In the court's April 17, 2026 Order denying Appellant's preferred maritime salvage lien, and denying Appellant's Motion at **DE 253** to Credit Bid the Value of her Maritime Salvage Lien at Judicial Sale of the Vessel, finding that the *voluntariness* element of marine salvage rendered her salvage ineligible for compensation (**DE 293 at 5)**, the court cited *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338 (2d Cir. 1983) for the proposition that "Voluntary service, the *sine qua non* on marine salvage, is rendered in the absence of a legal duty or obligation."

The district court's reliance on *B.V. Bureau Wijsmuller* ("*Wijsmuller*") in compiling its Order denying Appellant's salvage lien at **DE 293**, however, does not support the court's conclusion that Appellant's salvage services, which included a complete rebuild of the vessel's engine room and saltwater saturated mechanical equipment, were involuntary, and thus ineligible for a salvage award.

### B. "Abundantly Clear" Is Not a Recognized Salvage Involuntariness Standard

In *Wijsmuller,* the Second Circuit did not create an expansive doctrine allowing courts to infer compulsory salvage obligations from informal relationships, subjective expectations, or post hoc equitable impressions, including those inferred by the district court in the present Order under appeal at DE 293 in reaching its denial of salvage –

> *"Regardless of how one defines the relationship between Morron and the boat, it is abundantly clear that at the time of the flood she was under a preexisting obligation to render aid to the boat. That renders any salvage lien arising from services she provided while under that obligation invalid."*

**(DE 293 at 5).**

 "*Abundantly clear*" is not a recognized criterion for determining salvage voluntariness under existing maritime salvage law.

To the contrary, the court in *Wijsmuller* reaffirmed the traditional admiralty principle that salvage turns on the absence of a legally enforceable preexisting duty to render aid. The quoted sentence relied upon in the Order at **DE 293** - "*Voluntary service, the sine qua non on marine salvage, is rendered in the absence of a legal duty or obligation,*" id. at 338 - cannot be isolated from the actual holding and factual context of the case.

The salvor in *Wijsmuller* rendered successful rescue services to a government-owned vessel and cargo in distress without any contractual undertaking requiring

13

those services. After the district court awarded salvage compensation to the successful salvor, the United States appealed the order, and attempted to recast the rescue effort as something other than compensable salvage. The government argued, in substance, that the services were effectively gratuitous or charitable in nature and therefore outside the protection of salvage law.

The Second Circuit rejected that reframing. Rather than allowing the recipient beneficiary of successful rescue services to retroactively characterize the effort as voluntary benevolence or non-compensable assistance, the Second Circuit reaffirmed that the dispositive inquiry is whether the salvor was under a legally enforceable duty compelling the rescue effort. Id. at 338–39.

Critically, the Second Circuit explained that: "Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law." Id. at 339. In other words, even where the salvor may have acted from mixed motives, personal interest, optimism, or humanitarian concern, salvage law still protects the claim so long as the services were not compelled by a preexisting legal obligation. The government's appeal effort to diminish the salvor's services in *Wijsmuller* as essentially charitable or gratuitous after the fact was **expressly rejected by the Second Circuit**.

That same principle directly supports Appellant's voluntary salvage efforts here. The district court identified no enforceable or binding legal duty requiring Appellant to render aid to the vessel in the event of an emergency. Instead, the Order at **DE 293** inferred a compulsory obligation from the court's perception that Appellant had some relational connection to the vessel. But *Wijsmuller* does not permit courts to manufacture a preexisting duty from circumstantial impressions or equitable assumptions. The case stands for the opposite proposition: absent an actual enforceable legal obligation compelling performance, successful rescue services remain voluntary for purposes of salvage law.

Indeed, the reasoning in the Order mirrors the failed appellate argument cited by the district court at DE 293, which was also rejected by the Second Circuit in favor of the salvor in *Wijsmuller*. Just as the government appealed to the Second Circuit and attempted to retroactively recharacterize successful salvage efforts as gratuitous or non-compensable once the rescue succeeded, Appellees here sought to recast Appellant's extensive rescue and restoration efforts as something she was supposedly already obligated to perform - even though no enforceable agreement imposing such a duty exists in the record. The district court here misapplied the holding in *Wijsmuller* in its Order at **DE 293**, and failed to identify the legal source of the alleged obligation that would negate the voluntariness element of salvage.

The Second Circuit's actual holding confirms why the Order at **DE 293** was erroneous in its reasoning. Salvage doctrine exists to encourage private parties to undertake risky and burdensome rescue operations when no legal duty requires them to do so. Had the salvor in *Wijsmuller* been denied compensation merely because of some arguable relationship to the vessel or subjective expectation surrounding the rescue, the salvage claim would have failed there as well. Instead, the Second Circuit protected the salvor's right to compensation because both the District and Appeals court recognized that no enforceable duty required the rescue effort.

Here, Appellant acted without any binding contractual obligation, without recourse for failure to act, and without any consensual written agreement imposing a compulsory obligation on Appellant to assume financial or operational responsibility for marine peril response. The district court therefore extracted a single abstract sentence from *Wijsmuller* while disregarding the actual holding and doctrinal thrust of the case, which confirms that Appellant's rescue efforts were voluntary and compensable salvage services under longstanding admiralty law.

**C. The Court's Failure to Identify Any Legally Enforceable Preexisting Duty**

The order appealed from repeatedly refers to an alleged "established duty" owed by Appellant to the vessel, yet neither Plaintiff, Defendant, nor the court itself ever identified the legal source of that supposed duty. The court's Order states that

> **"***Plaintiff and Defendant fiercely argue that Morron's established duty to the vessel renders any salvage lien invalid.***"**

**DE 293 at 4.**

but neither the court nor the Appellees ever established what legally enforceable obligation actually existed, how it arose, or what doctrine imposed it. The absence of Appellant's express consent to assume any legally compulsory obligation is fatal to the involuntariness finding, because maritime salvage law requires an actual preexisting legal obligation - not merely the assertion that one must have existed.

Salvage voluntariness is not defeated by personal interest, familiarity, financial motivation, or prior involvement with the property. As *B.V. Bureau Wijsmuller* confirms, even substantial personal motivation or anticipated benefit does not negate voluntariness absent a binding legal duty compelling performance. 702 F.2d at 338–39.

The district court's reliance on what it characterized as "*abundantly clear*" circumstances surrounding Appellant's relationship to the vessel improperly

17

substituted subjective equitable impressions for the actual legal standard governing salvage voluntariness.

Neither *The Sabine*, *The Blackwall*, *Girard v. M/V Blacksheep*,[1] nor *B.V. Bureau Wijsmuller* authorizes courts to deny salvage based upon generalized notions of fairness, perceived moral obligation, or relational proximity to the vessel. To the contrary, *Wijsmuller* reaffirmed that salvage remains voluntary absent an actual legal obligation, even where the salvor acted with personal motivation or anticipated benefit. 702 F.2d at 338–39. The Second Circuit expressly rejected attempts to retroactively diminish salvage claims by recharacterizing the salvor's conduct as something effectively obligatory or gratuitous after the fact.

None of the factors relied upon, independently - or collectively - created a legally enforceable maritime duty to salvage another party's vessel.

### D. Purchase and Sale Agreement Expressly Disclaimed Implied Obligations

The operative Purchase and Sale Agreement of Brokerage Vessel, fully briefed in **DE 278 (**PSA Contract at DE 267-1 at ¶16, attached hereto as **( "EXHIBIT A")**),

---

[1] *The Sabine*, 101 U.S. 384 (1879).
*The Blackwall*, 77 U.S. (10 Wall.) 1 (1869).
*Girard v. M/V Blacksheep*, 840 F.3d 1351 (11th Cir. 2016).

and disregarded by the court in its Order denying salvage voluntariness at **DE 293**, expressly disproves the court's inference of compulsion to render salvage. The governing *Purchase and Sale Agreement of Brokerage Vessel*, dually executed by prospective purchaser and prospective seller (See **Exhibit A**) identified Appellant merely as a prospective "Buyer" and provided that "*Seller will bear the risk of loss or damage to the Vessel prior to Closing*" **(Exhibit A at ¶7)**. No closing occurred. The agreement further contained an express integration clause, which stated that it "*constitutes the entire agreement between the parties*" and that "*[t]here are no other duties, obligations, liabilities, or warranties, implied or otherwise, except as set forth herein,*" **(Exhibit A at ¶16),** none containing any salvage obligations.

Thus, rather than supporting the district court's inference of compulsory responsibility - "*regardless of how one defines the relationship between Morron and the boat,*" **(DE 293 at 5)** the written agreement governing the relationship between prospective buyer and prospective seller expressly disclaimed any unwritten or implied obligations outside the contract itself, unless agreed to in writing, signed by buyer and seller **(Exhibit A at ¶16).**

Under the district court's reasoning, any prospective purchaser could be retroactively transformed into an involuntary salvor stripped of a salvage award once the salvage is complete, in this case, spanning 2.5 years to attain salvage success to return the vessel to propulsion following the flood. Admiralty precedent

requires an actual legal duty - not an "*abundantly clear*" impression by the court that a prospective purchaser was apparently invested in the vessel's survival prior to its sinking. Because no such enforceable duty existed here, Appellant's rescue efforts remained voluntary and compensable salvage services as a matter of law.

### E. Proximity to the Vessel and Receipt of Notice Do Not Create Compulsory Salvage Obligation

The district court heavily relied in its reasoning, on the assertion that

> "*the initial flood damage report, submitted by Morron herself, demonstrates the vessel was moored at Morron's home at the time of the flooding incident, and it was Morron who was notified by phone call of the flooding.*"

**DE 293 at 5.**

But neither of those facts creates a compulsory salvage duty under maritime law. A vessel's location near an individual, or the fact that someone receives notice of marine peril, does not transform that person into an involuntary salvor stripped of salvage rights. Maritime salvage doctrine does not impose compulsory rescue obligations merely because a person happens to be nearby, familiar with the vessel, or an individual contacted to alert them of an emergency.

20

Moreover, the cited record does not establish what the order inferred from it. The referenced flood report merely reflected that Appellant received notice of the flooding incident and participated in emergency response communications. It did not create or evidence consent to assume compulsory salvage responsibility for the vessel, nor did it establish that Appellant accepted any legally enforceable obligation to salvage the vessel on behalf of the owner or lender. Receiving a phone call concerning a vessel in distress is not equivalent to entering into a binding maritime duty relationship that vitiates the voluntariness element of maritime salvage.

The court's reasoning effectively imposed a duty retroactively based on conduct occurring after the casualty rather than identifying a preexisting enforceable legal obligation existing before the rescue commenced. But salvage law requires the opposite inquiry. The voluntariness element asks whether the salvor was already legally bound to act before rendering aid. Here, no such obligation existed. Appellant was free to walk away from the vessel entirely without contractual liability for failing to dewater, preserve, restore, or rescue it. The owner retained risk of loss, legal title never transferred, and no agreement imposed casualty-response duties upon Appellant. Accordingly, the district court's involuntariness finding rests not on any identifiable source of law, but on inferred equitable

21

assumptions untethered from the governing contract or established maritime salvage principles.

## VII. LEGAL STANDARD OF STAY PENDING APPEAL

A stay pending appeal is governed by the traditional factors set forth in *Nken v. Holder*, 556 U.S. 418, 434 (2009), including:

**(1) likelihood of success on the merits;**

**(2) irreparable injury absent a stay;**

**(3) absence of substantial injury to other interested parties; and**

**(4) the public interest.**

In admiralty proceedings, preservation of the res pending appellate review is particularly significant because confirmation of a judicial sale generally extinguishes prior maritime liens and transfers title free and clear, with liens attaching only to substitute proceeds of sale.

**A. Likelihood of Success on the Merits**

Appellant has a substantial likelihood of success on appeal regarding the voluntariness element of maritime salvage. In denying Appellant's asserted salvage lien and corresponding credit-bid rights, the district court concluded, without identifying any legally enforceable contractual, statutory, or agency-based obligation requiring Appellant to render aid, that "Regardless of Morron's relationship to the vessel, it was clear she had a duty to render aid."

The district court additionally relied upon incorrect factual findings that the vessel was moored at Appellant's home at the time of the casualty, a finding Appellant challenged in **DE 305,** and which the lower court declined to correct at **DE 315**. Even assuming arguendo the vessel had been located at Appellant's residence, such circumstance would not create a legally binding duty to render or finance emergency salvage services to a vessel in marine peril.

Appellant contends that the order at **DE 293** expanded the voluntariness inquiry beyond the governing framework of maritime salvage law by relying upon inferred relational circumstances rather than a legally cognizable preexisting duty. As in *Girard v. M/V Blacksheep,* 840 F.3d 1351 (11th Cir. 2016), where the Eleventh Circuit reversed the district court for applying an improperly expanded salvage analysis inconsistent with established maritime principles, Appellant respectfully

submits that the order appealed from likewise applied an erroneous legal framework to the voluntariness element of salvage and inferred a duty inconsistent with the Purchase and Sale Agreement governing the Buyer and Seller's duties prior to the closing of a sale. See **Exhibit A**, attached hereto.

### B. Irreparable Injury Absent Stay

Absent an emergency stay, Appellant will suffer immediate and irreparable harm because confirmation of the judicial sale will transfer title free and clear of liens before adjudication of the dispositive appellate issues presently before this Court.

Unlike a conventional cash judicial sale generating deposited proceeds capable of preserving competing maritime claims pending appeal, Plaintiff seeks confirmation through a non-cash credit bid depositing no substitute proceeds into the Court registry.

Appellant further contends that the substitute custodian subsequently damaged and deteriorated the vessel following dispossession, thereby impairing the recoverable value of Appellant's asserted salvage lien and embedded restoration contributions. Confirmation of the sale through a non-cash credit bid would extinguish those disputed lien rights entirely before appellate review can occur.

Moreover, the vessel constitutes a unique maritime asset whose condition, restoration history, evidentiary value, and disputed salvage-related improvements cannot be fully recreated or adequately compensated through monetary damages alone once the res passes beyond the Court's practical control pending appeal.

Preservation of the status quo pending appeal is especially appropriate here because the proposed confirmation would transfer title to Plaintiff-Appellee itself through a substitute non-cash credit bid following the default of the original purported high bidder, substantially reducing any prejudice associated with temporary preservation of the res pending appellate review.

### C. Absence of Substantial Injury to Other Interested Parties

A temporary stay will not substantially injure Plaintiff or any other interested party because Plaintiff already possesses and controls the vessel through the substitute custodian process, and the requested relief merely preserves the status quo pending appellate review.

No bona fide third-party purchaser will be prejudiced because the original purported high bidder defaulted and paid no deposit toward consummation of the sale.

By contrast, denial of a stay would permit transfer of title through a non-cash credit bid before unresolved issues concerning alleged custodial deterioration, competing

maritime claims, and disputed offsets affecting the proposed credit bid have been fully evaluated or adjudicated.

Preservation of the res pending appeal therefore imposes comparatively minimal prejudice while avoiding potentially irreversible extinguishment of disputed maritime claims before judicial review is complete.

### D. Public Interest

The public interest strongly favors issuance of a stay. Maritime law has long recognized the important public policy of encouraging voluntary salvage efforts by protecting the rights of those who render aid to vessels in marine peril.

If salvors may have their asserted maritime liens extinguished through post hoc expansion of the voluntariness standard absent any legally cognizable preexisting duty, and then be denied meaningful appellate review before the res is transferred free and clear of liens without adequate substitute proceeds preserved in the registry, future salvors will be substantially disincentivized from undertaking costly and risky rescue, preservation, and restoration efforts.

Preservation of the res pending appellate review therefore promotes confidence in the integrity of maritime lien enforcement, judicial sale procedures, and the longstanding public policy favoring voluntary salvage operations in aid of distressed vessels.

## VIII. CONCLUSION

Appellant respectfully submits that the equities strongly favor preservation of the status quo pending adjudication of this interlocutory appeal.

Absent a stay, title may transfer free and clear through a non-cash credit bid based upon a debt amount still subject to substantial unresolved offsets for custodial damage and use of the vessel against the purported outstanding debt **(DE 285 at 11)**, while no deposited substitute res exists to preserve Appellant's asserted maritime lien rights pending appeal, and no bond is required by the district court to preserve Appellant's asserted maritime lien rights pending appeal.

No adequate substitute cash fund presently exists in the Court registry to preserve Appellant's asserted maritime lien rights pending appeal.

## IX. REQUEST FOR EMERGENCY STAY PENDING APPEAL

WHEREFORE, Appellant respectfully requests that this Court enter an EMERGENCY STAY prohibiting confirmation of sale or transfer of title pursuant to DE 313 of the district court docket arising from the April 21, 2026 judicial sale, pending resolution of this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(3), and that such stay be granted without bond.

Respectfully submitted,
**/s/ Danielle Morron**
Danielle Morron, Pro Se
3401 SW Sawgrass Villas Dr., Unit 11-C
Palm City, FL 34990
772-783-3917
dmopallc@outlook.com

# EXHIBIT A



# PURCHASE AND SALE AGREEMENT FOR BROKERAGE VESSEL

| BUYER: Danielle Morron and/or assigns | SELLER: Owner of Record |
|---|---|
| Address: 3401 S.W. Sawgrass Villas Drive, 11-C  Palm City, FL 34990 | Address: |
| Nationality: | Nationality: |
| VESSEL NAME: | MANUFACTURER: Mangusta |
| Model: Express | Length Overall: 92' |
| Year: 2005 | ☐ Doc or ☐ Reg No.:                  Flag: |
| Hull No.: 92/10 | Engine Description: Twin MTU |
| Selling Broker: Rupert Gregory - Rick Obey Yacht Sales | Listing Broker: Rupert Gregory - Rick Obey Yacht Sales |

| IMPORTANT DATES | PURCHASE PRICE |
|---|---|
| Offer Date: 5/10/21 | Purchase Price: $550,000 |
| Offer Expiration Date: 5/12/21 | Less Deposit: $55,000 |
| Accept/Reject Date: 6/2/21 | Less Trade Allowance (see Addendum): |
| Closing Date: 6/9/21 | Balance: $495,000 |

**Delivery Location:** Present Location
*NOTE:* If Vessel is to be moved to the Delivery Location, such location must *be specified with precision.  The mere listing of a port or city is insufficient.*

**ADDITIONAL REGISTERED VESSELS INCLUDED** ☐ Yes ☐ No

1. **Agreement**. Buyer agrees to purchase, and Seller agrees to sell, all right, title and interest to and in the Vessel described above on the terms and conditions set forth in this Purchase and Sale Agreement ("PSA").  Capitalized terms used in this PSA refer to the corresponding terms in the table above unless otherwise defined herein. The "Effective Date" of this PSA is the date on which is has been signed by both parties. "Vessel" also includes all gear, machinery, equipment, furniture, fuel, consumables, and all registered or unregistered tenders, toys, articles and appurtenances on board the Vessel and/or included on the Vessel's listing specification as of the date of this Agreement, except for items listed on the Exclusions List provided by the Seller or Listing Broker on the earlier of (a) five days from the Effective Date or (b) the Accept/Reject Date, which items are not included in the sale. Buyer will be deemed to have accepted the Exclusion List if it accepts the Vessel.  Listing Broker and Selling Broker shall be referred to herein as the "Brokers."  If there is a Trade Allowance, the conditions of the trade-in will be governed by the attached Trade-In Vessel Addendum. If either party fails to sign this PSA and deliver it to the other party on or before the Offer Expiration Date, this PSA will be ineffective.

2. **Deposit**. Within __3__ business days (3 business days if left blank) following Seller's signature of this PSA, Buyer shall pay the Deposit to the Selling Broker's account, as acknowledged below, as a deposit toward the Purchase Price to be held subject to the terms of this PSA.  Seller may refuse to permit Buyer to proceed with the trial run, survey and other inspections of the Vessel until the Deposit has cleared into the Selling Broker's escrow account.

3. **Survey Option; Acceptance of Vessel; Conditions of Survey**. Buyer's obligation to purchase the Vessel is subject to Buyer's satisfaction, in Buyer's sole discretion, with a trial run and survey of the Vessel though Buyer may elect not to have the Vessel inspected.  If inspected: (a) Buyer will select the surveyor, (b) the surveyor, and not the Brokers, will be the sole party responsible for any errors or omissions with respect to the survey, notwithstanding that the Brokers may have provided information to and assisted Buyer with hiring the surveyor, (c) *Seller shall make the Vessel available and Buyer shall complete the trial run and survey as soon as practicable*, (d) Seller shall pay all running expenses for, and assume the risks associated with, the trial run, and Buyer shall pay *all* costs of the survey, including associated costs, e.g., haul-out, dry dock, and subcontractors' charges, (e) Buyer and its surveyor will be solely responsible for determining the scope of the survey and the trial run to assess the Vessel's conformity with Buyer's requirements and (f) Buyer shall deliver written notice of rejection or acceptance of the Vessel to Seller or the Listing Broker on or before the Accept/Reject Date.  *Whether or not Buyer has inspected the Vessel, Buyer will be deemed to have rejected the Vessel if it fails to give timely written notice of its acceptance.  Upon Buyer's acceptance of the Vessel, Seller will not make any use of the Vessel pending Closing (defined in Paragraph 4) except to move the Vessel to the Delivery Location.*  If Buyer

Buyer's Initials: _____

Page 1 of 4                    ©2020 International Yacht Brokers Association.  All rights reserved.                    Rev.3.10.20

Seller's Initials: _____

*This form was prepared for the exclusive use and benefit of the members of the IYBA.  The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use.  The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.*

rejects or is deemed to reject the Vessel, after all expenses incurred on Buyer's behalf have been paid, (i) the Selling Broker shall return the Deposit to Buyer, (ii) this PSA will terminate, and (iii) the parties and the Brokers will be released from any further liability hereunder. The Brokers will not be responsible for the cost to correct any defects or deficiencies noted during the trial run and survey.

4. **Closing**. The transfer of Vessel's ownership ("Closing") will occur on the Closing Date at the Delivery Location simultaneously with payment of all funds due from the Buyer and delivery of originals of all other documents necessary for transfer of good and marketable titleto Buyer. If the Vessel must move to the Delivery Location, Seller should not deliver Vessel to the Closing Location unless funds have been paid in full or are being held subject to an escrow conditioned only upon delivery of the Vessel to the Delivery Location and release of title documents to the Buyer. Closing may be facilitated by overnight courier or electronic means. Seller shall deliver the Vessel (as defined in Paragraph 1) to Buyer at the Delivery Location except for fuel consumed during the trial run and any voyage to the Delivery Location. On or before the Closing Date, Seller must deliver to the Selling Broker all documents necessary to transfer title to the Vessel (and all other items hereby required to be delivered) to Buyer. At Closing, Buyer shall pay the Balance to Seller (subject to Paragraph 6) and/or to the Selling Broker for onward transfer to Seller by wire transfer. Any funds Seller owes to (i) the Brokers for the commission, storage, insurance, repairs and/or other items or (ii) the holder of any other Encumbrance, will be deducted from the amount due Seller by the Selling Broker prior to disbursement of funds to Seller, which hereby irrevocably instructs any Deposit holder to pay the Commission from the Deposit to the Brokers pursuant to the terms hereof.

5. <u>Brokers</u>. The parties acknowledge that the Selling Broker and Listing Broker are the only brokers that procured this PSA. If the Listing Broker and the Selling Broker are the same brokerage, the parties consent to that Broker acting as a dual-agent in this transaction, i.e., representing both Buyer and Seller, and the Broker may disclose to both parties facts known to the Broker materially affecting the Vessel's value or desirability; provided, however, that in such instance the Broker shall not, without Seller's consent, disclose to Buyer that Seller is willing to sell the Vessel for an amount less than the asking price or, without Buyer's consent, disclose to Seller that Buyer is willing to pay a price greater than the offering price. If the Listing Broker and the Selling Broker are different, the Listing Broker will represent Seller only and owe no duties, fiduciary or otherwise, to Buyer, and the Selling Broker will represent Buyer only and owe no duties, fiduciary or otherwise, to Seller (though paid by Seller). The Brokers are obligated to perform only the duties expressly set forth herein and no implied duties or obligations may be read into this PSA. Seller shall be solely responsible for payment of commission due to the Brokers in connection with the sale of the Vessel as set forth herein. Each party represents and warrants to the other that he has not employed or dealt with any other broker, agent or finder in carrying out the negotiations relating to the sale of the Vessel to Buyer and acknowledges that the Brokers are third-party beneficiaries to this PSA.

6. **Seller's Representations; Requirements for Closing**. Seller represents and warrants that it will transfer to Buyer good and marketable title to the Vessel, free and clear of all debts, claims, maritime or common law liens, security interests, encumbrances, excise taxes, and any other applicable taxes, customs' duties, or tariffs due to any state, country, regulatory and/or taxing authority of any kind whatsoever (collectively, "Encumbrances"). No less than two (2) business days before Closing, Seller shall deliver to Buyer (a) satisfactory evidence of title, (b) proof of payment or removal of all Encumbrances (except for those encumbrances that will be paid in full at closing), (c) a guaranty and indemnification from Seller guaranteeing Seller's representations and warranties in this Paragraph 6, (d) if Seller is a legal entity, a personal guaranty and indemnification from Seller's beneficial owner(s) guaranteeing Seller's representations and warranties in this Paragraph 6, and (e) copies of any other documents necessary for transfer of good and marketable title to Buyer. Seller shall pay any cost associated with, and shall cooperate fully to obtain, any authorization for sale required from any governing authority. Any party which is a legal entity will provide to the other prior to Closing (i) proof that it is in good standing under the laws of the State or other jurisdiction under which the entity has been formed, (ii) a consent action or resolution demonstrating the entity's duly authorized decision to purchase or sell the Vessel as well as the authority of the individual delivering or accepting the Vessel and/or executing this PSA and/or purchase and sales documents,(iii) a power of attorney demonstrating the authority of the individual delivering or accepting the Vessel and (iv) as to Seller, its wire transfer information.

7. **Risk of Loss; *Force Majeure*.** Seller will bear the risk of loss of or damage to the Vessel prior to Closing. If the Vessel is damaged subsequent to Buyer's acceptance and the necessary repairs will cost less than five percent (5%) of the Purchase Price and require fewer than 30 days to complete, then (a) Seller must repair the damage prior to Closing in accordance with sound marine practices to the standard of the Vessel immediately prior to the damage and Buyer may inspect such repair, (b) Buyer must pay the Balance and take delivery of the Vessel as repaired, and (c) the Closing Date will be extended by the length of the repair period. If the Vessel is damaged to a greater extent subsequent to Buyer's acceptance, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel. Either party's obligation to perform will be suspended to the extent required to accommodate unforeseeable events beyond that party's reasonable control ("*Force Majeure* Events"), including, without limitation, acts of God, acts of terrorism, strikes, lockouts, riots, acts of war, fire, communication line failures, computer viruses, power failures, accidents, tropical storms, hurricanes, earthquakes, or other natural disasters. If a *Force Majeure* Event occurs, the time periods referred to in this PSA, including, without limitation, the Closing Date, will be deemed extended by the time necessary to permit the affected party to perform in accordance with this PSA; provided, however, if the *Force Majeure* Event delays the Closing Date for a period of at more than 30 days, either party may terminate this PSA with the same consequences as if Buyer had rejected the Vessel.

8. **Default**. *Notwithstanding anything herein to the contrary, if the Deposit is not paid when due* or Closing is not consummated due to Buyer's non-performance, including, without limitation, failure to pay the Balance or execute all documents necessary for completion of the

Buyer's Initials: _____

Seller's Initials: _____

©2020 International Yacht Brokers Association. All rights reserved.      Rev. 3.10.20

purchase by the Closing Date: (i) the Deposit shall be retained by (or if the Deposit was not paid, Buyer shall pay a like amount to) Seller and the Brokers as liquidated and agreed damages, as consideration for the execution of this PSA, in full settlement of all claims between the parties, (ii) the Selling Broker shall return to Buyer any other funds received from Buyer, and (iii) the parties will be relieved of all obligations under this PSA. Buyer and Seller agree that the Deposit will be applied first to payment of any unpaid costs or expenses that Buyer or Broker incurred against the Vessel and then divided fifty percent (50%) to the Seller and fifty percent (50%) to the Brokers, which the Brokers shall divide in the same proportions as the commission would have been divided had a sale been consummated. If the Closing is not consummated due to Seller's non-performance, the Deposit, and any other money paid or deposited by Buyer, pursuant to this PSA will be returned to Buyer upon demand or Buyer will have the right of specific performance. Seller agrees that specific performance is reasonable in light of the uniqueness of the Vessel, difficulty of proof of loss, and the inconvenience or impossibility of otherwise obtaining an adequate remedy. On Seller's default, Seller shall forthwith pay the Brokers the same commission otherwise payable had the transaction closed.

9. **Sales and Use Taxes**. Sales or use taxes payable on Buyer's purchase of the Vessel, if applicable, are Buyer's responsibility, and Buyer shall pay the taxes due to the Selling Broker at Closing. Buyer hereby indemnifies and holds harmless Seller and the Brokers against and from any sales or use taxes for which Buyer is responsible.

10. **REPRESENTATIONS AND WARRANTIES**. SELLER AND THE BROKERS BELIEVE THAT ANY INFORMATION ANY OF THEM HAS PROVIDED ON THE VESSEL IS GOOD AND CORRECT AND OFFER THE INFORMATION IN GOOD FAITH, BUT DO NOT AND CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. BUYER WARRANTS AND REPRESENTS, AS OF THE TIME OF CLOSING, THAT IT (A) WILL HAVE FULLY INSPECTED AND MADE A TRIAL RUN OF THE VESSEL (OR HAVE VOLUNTARILY WAIVED THESE RIGHTS) AND (B) IS NOT RELYING ON ANY ADVERTISEMENTS, PROMISES, DESCRIPTIONS, AFFIRMATIONS, OR REPRESENTATIONS (WHETHER ORAL OR WRITTEN, PRIOR TO OR CONTEMPORANEOUS WITH THIS PSA) PROVIDED BY THE SELLER OR BROKERS. UPON CLOSING, BUYER WILL BE DEEMED TO HAVE ACCEPTED THE VESSEL IN ITS **"AS IS"** CONDITION. SELLER AND THE BROKERS HAVE GIVEN NO WARRANTY, EITHER EXPRESSED OR IMPLIED, AND MAKE NO REPRESENTATION AS TO THE CONDITION OF THE VESSEL, ITS FITNESS FOR ANY PARTICULAR PURPOSE OR MERCHANTABILITY, **ALL OF WHICH ARE DISCLAIMED.**

11. **Financing**. Buyer's obligations are not contingent upon Buyer's obtaining financing. Buyer represents that it will arrange financing, if necessary. Buyer and Seller acknowledge that the Brokers have made no representations or warranties with respect to Buyer's ability to obtain financing, Buyer's qualifications to obtain any type of mortgage on the Vessel, or Buyer's ability to document or register the Vessel in any jurisdiction.

12. **Counterparts**. The parties may sign this PSA in any number of identical counterparts, each of which will be deemed an original (including signatures evidenced via facsimile, email or other electronic means) as if the signatures were upon the same instrument.

13. **Binding Effect; Contemporaneous Contracts; Future Sales**. This PSA is binding on all parties, their heirs, personal representatives and/or assigns. Seller shall not sell the Vessel or enter into any contract for the sale of the Vessel while this PSA is in effect. If a sale is not consummated in accordance with the terms of this PSA, and Buyer and Seller enter into a contract between themselves for the sale of the Vessel, whether directly or through an entity under a party's ownership or control, within two years after this PSA is terminated, Seller agrees to pay the Brokers an amount identical to the commission the Brokers would have received had the transaction contemplated under this PSA closed.

14. **Escrowed Funds**. The parties acknowledge that (a) the Selling Broker will not be responsible for the Deposit until the funds have cleared into the Selling Broker's account, (b) the Selling Broker shall hold the Deposit in escrow once the funds have cleared and any other funds received by either Broker from any party will be held in trust for that party, (c) the Selling Broker may retain the commission due the Brokers prior to disbursement of the Deposit or Balance to Seller, and (d) in any dispute involving any funds held by the Brokers, Buyer and Seller will indemnify the Brokers for legal fees and costs relating in any way to the dispute, including those incurred in any appeals (which obligation is secured by a lien on the escrowed funds) and those relating to a claim for a commission, except as to a Broker found, in a final non-appealable judgment, to have engaged in willful misconduct or acted with gross negligence.

15. **Additional Terms**.  THIS OFFER IS FOR THE PURCHASE OF A 50% PARTNERSHIP IN THE OWNERSHIP OF THE VESSEL. All details to be agreed by both parties under a separate addendum prior to vessel acceptance date.

16. **Miscellaneous**. This PSA, including its exhibits and schedules, is the **entire agreement** between the parties pertaining to the subject matter hereof and **supersedes** all prior and contemporaneous negotiations, agreements, representations, warranties, and understandings pertaining thereto, be they in writing, oral, or otherwise. If a Broker becomes a party to any litigation involving this PSA, the Broker shall be reimbursed for their costs and attorney's fees, at all pretrial, trial and appellate levels, by the party or parties found to have breached this PSA. In the event of any dispute between the parties hereto arising out of the subject matter of this PSA, the prevailing party (including the Brokers) shall be entitled to recover reasonable expenses, attorney's fees and costs for all pretrial, trial and appellate proceedings. If any term, condition, or provision of this PSA is held to be unenforceable for any reason, it shall be interpreted to achieve the intent of the parties to this PSA to the extent possible rather than avoided. In any event, all other terms, conditions and provisions of this PSA shall be deemed valid and enforceable. There are no other duties, obligations, liabilities, or warranties, implied or otherwise, except as set forth herein. This PSA may not be amended or modified, except in writing, signed by Buyer and Seller. Notice and delivery given by or to the attorney or Broker representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by personal delivery, overnight courier, facsimile, email, or other electronic means, and shall be effective upon delivery with proof of delivery retained. Buyer may assign this PSA to

Buyer's Initials: _____     Seller's Initials: _____

©2020 International Yacht Brokers Association. All rights reserved.     Rev. 3.10.20

any member(s) of Buyer's immediate family or any entity owned or controlled by Buyer and/or any member(s) of his immediate family. Otherwise, neither party may assign this PSA without the other party's consent, which consent shall not be unreasonably withheld. No claim or right arising out of this PSA can be waived or discharged by one party, in whole or in part, unless in writing, nor shall any waiver be applicable except in the specific instance for which it is given. Paragraph headings are informational and included only for convenience.

**17.** <u>**Governing Law and Dispute Resolution**</u>. **Check (a), (b) or (c). If none checked, (a) will apply.** Any dispute involving this Agreement will be resolved: **(a)** ☐ in the courts located in the State of _____ (Florida, if left blank), **(b)** ☐ by binding arbitration in the State of _____ (Florida, if left blank), **(c)** ☐ by binding arbitration in London, England. *If (a) or (b) is selected*: (i) this Agreement will be governed by and interpreted according to the law of the State of _____ (Florida, if left blank) regardless of its principles of conflicts-of-laws and (ii) the proceedings will be conducted in the county of the main office of the Selling Broker, or if the Selling Broker has no office in Florida, in _____ (Fort Lauderdale, Florida, if no other city indicated). *If (b) is selected*, the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in force when the arbitration is commenced will apply unless the following rules apply: _____. If the amount in controversy including counterclaims is not more than USD $1,000,000.00, the parties shall jointly select a single arbitrator from the list of arbitrators maintained by the International Yacht Brokers Association ("IYBA") within twenty (20) days of the giving of notice of arbitration. If the parties are unable to agree upon the arbitrator, the IYBA shall have the power to make the appointment of the single arbitrator. If the amount in controversy is greater, the parties shall each appoint one arbitrator and the two arbitrators will jointly appoint a third arbitrator. If they cannot agree on the third arbitrator within 14 days, either party may request that the IYBA appoint the third arbitrator from the list of arbitrators maintained by the IYBA. The decision of the single arbitrator, or if a three abitrator panel, any two of them will be final and binding on the parties. An action may be brought in any court of competent jurisdiction to enforce any arbitral award or compel arbitration. If (c) is selected: (i) this Agreement will be governed by and interpreted in accordance with English law regardless of its principles of conflicts-of-laws, (ii) the parties irrevocably agree that any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Paragraph, (iii) the arbitration shall be conducted in accordance with the rules of London Maritime Arbitrators Association ("LMAA") current when the arbitration is commenced, (iv) if the amount in dispute (including counterclaims) is less than USD$100,000, its Small Claims Procedure will apply, while if greater than or equal to USD$100,000 and less than USD$400,000, its Intermediate Claims Procedure will apply. Whatever option is selected, the parties irrevocably submit to the exclusive jurisdiction of such court or arbitral forum, waive any objection they now or hereafter may have to venue or convenience of forum, agree that all claims relating to the proceeding will be decided only in such court or arbitral forum and, further, not to bring any claim relating to this Agreement in any other court or arbitral forum. The parties, having had the opportunity to seek legal counsel, waive trial by jury for claims arising under this Agreement, whether against each other or any Broker.

**BUYER:** _Danielle R Morron (signature)_

Print: ___Danielle R Morron___
Title: _____
Date: ___05/10/2021___

**SELLER:** _Dr Stanley Kalish (signature)_

Print: ___DrDtanley Kalish___
Title: _____
Date: ___05/10/2021___

### SELLING BROKER DEPOSIT CONFIRMATION (Subject to clearance of funds)

Print: _____
Title: _____

Amount: _____
Date: _____

Buyer's Initials: _DMs (initials)_

Seller's Initials: _SK (initials)_

Page 4 of 4

©2020 International Yacht Brokers Association. All rights reserved.

Rev. 3.10.20

*This form was prepared for the exclusive use and benefit of the members of the IYBA. The parties and Brokers hereby release the IYBA from any liability for damages resulting from or related to its use. The IYBA expressly disclaims any and all warranties, including merchantability and fitness for a particular purpose, related to the use of this form.*

# APPENDIX OF RELEVANT DISTRICT COURT RECORD MATERIALS

**DE 253 -** Appellant's Motion for Authorization to Credit Bid Salvage Lien at Judicial Sale

**DE 269 -** Appellant's Declaration Regarding Absence of Preexisting Duty

**DE 278 -** Morron Consolidated Reply Regarding Asserted Maritime Salvage Lien, Credit Bid Rights, and Interlocutory Sale Mechanics

**DE 285 -** Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment

**DE 293 -** Order Denying Appellant's Maritime Salvage Lien and Motion to Credit Bid

**DE 296 -** Appellant's Motion to Stay Confirmation Pending Appeal

**DE 300 -** Order to Show Cause Regarding Stay and Bond Requirement

**DE 301 -** Appellant's Response Regarding Stay and Preservation of the Res

**DE 309 -** Plaintiff-Appellee's Response Opposing Stay Pending Appeal

**DE 310 -** Order Denying Stay Pending Appeal

**DE 313 -** Plaintiff-Appellee's Motion to Confirm Sale to Plaintiff-Appellee

**DE 315 -** Order Denying Appellant's Motion for Reconsideration and/or to Correct the Record

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 4638 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

Dated: May 9, 2026

**/s/ Danielle Morron**

Danielle Morron, Pro Se